# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| J.N. and J.N., in their Own Right and as Parents and Natural Guardians of J.N., a Minor, | : : : | CIVIL NO. 1:14-CV-974 |
| | : | (Chief Judge Conner) |
| Plaintiffs | : : | |
| v. | : : | |
| SOUTH WESTERN SCHOOL DISTRICT, | : : : | |
| Defendant | : : | |

## MEMORANDUM

Minor plaintiff J.N., by and through his parents J.N. and J.N. ("Parents"), filed the above-captioned action, alleging that defendant South Western School District ("District") violated the Individuals with Disabilities Education Act ("IDEA"), as amended, 20 U.S.C. § 1400 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), as amended, 29 U.S.C. § 794. (See Doc. 1). Plaintiffs appeal the decision of Pennsylvania Special Education Hearing Officer Jake McElligott ("Hearing Officer") that they are not entitled to (1) tuition reimbursement for the costs of J.N.'s 2013-2014 private school placement; (2) compensatory education for extended school year programming during the summer of 2013; or (3) reimbursement for independent evaluation services and expert testimony. Presently before the court are cross-motions (Docs. 29, 30) for judgment on the administrative record. After thoroughly reviewing the record, and for the reasons that follow, the court will deny plaintiffs' motion and grant the District's motion.

## I.  Background

### A.  Factual Background[1]

J.N. is a fifteen-year-old student who suffers from attention deficit hyperactivity disorder ("ADHD"); seizure disorder; dysgraphia; neurofibromatosis; impaired speech, hearing, and vision; and specific learning disabilities in reading, mathematics, and written expression.  (H.O.D. ¶ 4; P-1 to P-4; P-6).  J.N. attended a District intermediate school for the 2012-2013 academic year and part of the summer of 2013, at which point Parents unilaterally enrolled J.N. in private school.  Plaintiffs contend that the District failed to offer J.N. a free appropriate public education ("FAPE") for the summer of 2013 and the 2013-2014 academic year.[2]  (See Doc. 1).  The court finds it useful to explicate J.N.'s medical and educational history prior to and during the time period at issue.

#### 1.  *Kindergarten Through Fifth Grade*

Parents homeschooled J.N. from kindergarten through fifth grade.  (P-34 ¶¶ 7, 12, 18, 23).  Prior to kindergarten, J.N. was diagnosed with speech and language impairments and neurofibromatosis, a disorder which causes tumors to form on nerve

---

[1] Citations to the record include the Hearing Officer's March 13, 2014 decision (Doc. 9-2 ("H.O.D.")); the notes of testimony from September 23, 2013, December 3, 2013, December 4, 2013, December 11, 2013, and January 17, 2014 (Docs. 9-5 to 9-9 ("N.T. __")); plaintiffs' exhibits (Docs. 9-11 to 9-16 ("P-")); and the District's exhibits (Docs. 9-17 to 9-34 ("S-")).

[2] In November 2012, the parties entered into a settlement agreement regarding the District's obligations to J.N. between kindergarten and fifth grade.  (See P-20). Under the terms of the agreement, Parents released the District from liability for the 2012-2013 school year in return for certain compensatory education and fees.  (Id. ¶ 10).  Accordingly, plaintiffs' due process complaint covers only the summer of 2013 and the 2013-2014 academic year.  (See 9-35).  All prior events will be considered solely for their relevance thereupon.

tissue.  (Id. ¶¶ 2-3).  From kindergarten through third grade, J.N. struggled to master

basic grade-level concepts in reading, writing, and mathematics.  (Id. ¶¶ 7, 12, 16).  In

February 2011, Parents arranged for Dr. Susan L. Calhoun ("Dr. Calhoun") of the

Pennsylvania Psychiatric Institute to conduct a psychological evaluation of J.N.  (Id.

¶¶ 18-19; see P-1).  Dr. Calhoun determined J.N.'s IQ to be 73 and diagnosed him with

ADHD, dysgraphia, and specific learning disabilities in reading, math, and written

expression.  (P-1 at 3).  In October 2011, Dr. Cheryl D. Tierney of the Penn State

Milton S. Hershey Medical Center confirmed Dr. Calhoun's diagnoses.  (P-34 ¶ 23).

Thereafter, Parents scheduled additional medical examinations to ascertain the scope

of J.N.'s learning disabilities.  (Id. ¶¶ 28, 29, 32).

Ms. Doris Golden ("Ms. Golden") of Pediatric Therapy Associates ("PTA")

conducted a speech and language evaluation with J.N. in January 2012.  (P-2).  Ms.

Golden concluded that J.N. suffered from "a moderate deficit with immediate memory

and vocabulary."  (Id. at 1).  Ms. Kimberly Wilshere ("Ms. Wilshere") of PTA

subsequently administered an occupational therapy examination to J.N.  (P-3).  Ms.

Wilshere recommended that J.N. obtain weekly occupational therapy for "upper

extremity strengthening, visual motor skills, and handwriting."  (Id. at 4).  In May

2012, Parents obtained an audiologic evaluation report from Ms. Mary-Theresa James

("Ms. James") of The Reading Hospital at Wyomissing Plaza's Speech and Hearing

Center, which found that J.N. suffered from mild hearing loss.  (P-4 at 3).

In July 2012, J.N. attended a summer session offered by The Janus School

("Janus"), a small, private institution that offers individualized curricula for students

with learning disabilities.  (See P-9; P-47 at 6; N.T. at 296-97).  Additionally in July

2012, Parents employed Dr. Margaret Kay ("Dr. Kay"), a certified school psychologist, to conduct an independent educational evaluation ("IEE") of J.N. (P-7). Dr. Kay's IEE determined J.N.'s IQ score to be 71. (Id. at 9). Measured against his age group within the general population, this score converted to a percentile rank of 3. (Id. at 10). Dr. Kay also found that J.N. tested in the "extremely low" range on perceptual reasoning, the "low average" range in working memory, and the "borderline" range in processing speed, and that J.N. performed poorly in the reading skills categories of word reading, pseudoword decoding, and oral reading fluency. (Id. at 3, 10, 17-18).

In the IEE report, Dr. Kay concluded that J.N. suffered from multi-handicapping exceptionalities, *to wit*: visual impairment; orthopedic impairment; hearing impairment; speech and language impairment; specific learning disabilities in basic reading, reading fluency, written expression, math reasoning, and math calculation; and other health impairments stemming from J.N.'s prior diagnoses. (Id. at 26-27). Based on her assessment of J.N., Dr. Kay provided an extensive list of specially designed instructions ("SDIs") for the District to consider implementing in light of J.N.'s unique special needs. (Id. at 27-34). Specifically, Dr. Kay recommended the Wilson Reading System ("Wilson")—a research-based teaching tool primarily focused on phonics—as the basis for J.N.'s SDIs in reading. (Id. at 28). Overall, Dr. Kay opined that J.N. "require[d] placement in a small, structured school setting with a program . . . geared toward meeting the needs of students with non-verbal or right hemispheric learning disorders." (Id. at 37-38). She expressed reservations regarding the District's ability to provide such a program and recommended Janus as an appropriate placement for J.N. (Id. at 37).

4

### 2. *Sixth Grade (2012-2013)*

J.N. enrolled as a sixth-grade student in the District for the 2012-2013 school year. In August 2012, the District issued an evaluation report ("ER") of J.N., wherein it concluded that J.N. was eligible for special education.[3] (P-10). The District's school psychologist, Ms. Melissa Bush ("Ms. Bush"), and the District's reading supervisor, Dr. Aileen Hower ("Dr. Hower"), conducted the examinations upon which the ER relied. (N.T. at 530, 722). The ER testing indicated that J.N. read words at a 3.5 grade level; comprehended written material at a third grade level; and read accurately at a level commensurate with second grade spring semester. (P-10 at 3, 5).

On August 27, 2012, Parents met with District teachers and administrators to develop J.N.'s individualized education program ("IEP") for the 2012-2013 school year.[4] (See P-11). Therein, the parties agreed to supplement the program throughout the year based upon J.N.'s progress and desiderata. (Id. at 9). The initial IEP set forth measurable annual goals in mathematics, reading, and writing[5] and allocated approximately 63% of J.N.'s time to regular classroom education with non-disabled peers. (Id. at 17-21, 28). J.N.'s reading goals encompassed three categories: reading

---

[3] The IDEA defines "special education" as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including—(A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education." 20 U.S.C. § 1401(29).

[4] An IEP is a "detailed instruction plan" for each student protected under the IDEA which consists of "a specific statement of a student's present abilities, goals for improvement, services designed to meet those goals, and a timetable for reaching the goals via the services." Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 756 (3d Cir. 1995).

[5] J.N.'s annual writing goal was to write and edit a five-sentence paragraph on a third grade level. (P-11 at 18).

fluency, reading comprehension, and decoding.[6] The IEP offered SDIs in the form of, *inter alia*, "opportunity to complete . . . assignments in a small group or alternative location," "oral tests in lieu of written examinations for content area subjects," "extended time to . . . complete assignments," and "additional wait time . . . to formulate answers." (Id. at 22-23). The District also assigned a personal care assistant to J.N., to provide writing assistance and general classroom support on a daily basis. (N.T. at 1181-85).

The parties revised J.N.'s IEP on multiple occasions, meeting in September 2012, October 2012, January 2013, February 2013, and April 2013 to do so. (S-13 to S-22). In October 2012, the parties designated System 44 as J.N.'s reading instruction program. (S-14 at 10-11). The IEP described System 44 as a "foundational reading and phonic intervention technology program for our most challenged readers in Grades 3-12+." (Id. at 10). It remained J.N.'s assigned reading program throughout the academic year. (N.T. at 794-95).

In February 2013, the parties met to determine J.N.'s eligibility for extended school year ("ESY") programming during the upcoming summer. (See S-22). After reviewing the District's progress monitoring data on J.N., the parties revised his IEP to include an individualized program of ESY services for the summer of 2013. (S-16 at 47-48). They found that J.N. required ESY programming because he was "at a critical point of instruction and need[ed] time to practice or generalize." (Id. at 47). J.N.'s

---

[6] J.N.'s annual reading goals were as follows: (1) "Given a one-minute timed reading probe at the 2.5 grade level, [J.N.] will increase his oral reading fluency to 94 words correct per minute (wcpm) with 80% accuracy for three consecutive trials;" (2) "Given a 2.5 grade reading comprehension probe, [J.N.] will read with 80% comprehension for three consecutive probes;" and (3) "[J.N.] will encode with 80% accuracy on [three] consecutive trials." (S-12 at 26-28).

6

amended IEP noted that he had "moved from a [reading] [c]omprehension level at the 2.5 grade level to the 4.0 grade level" and "shown growth in his accuracy, decoding, and encoding as noted by teacher observation and progress graphs." (Id.)

By April 2013, J.N. had achieved the annual reading goals set forth in his IEP, allowing him to progress to more advanced benchmarks. Specifically, the IEP increased J.N.'s reading comprehension goal to a fifth grade level and his reading fluency goal to 110 words correct per minute at a third grade level. (S-17 at 21-22). After J.N. met his decoding objective, the parties declined to set a new goal, determining that his decoding skills would be monitored as a component of reading fluency goals thereafter. (Id. at 15).

### 3. *Summer 2013*

On May 15, 2013, the parties met to discuss J.N.'s IEP for the 2013-2014 school year. (S-11 at 20). The District generated a preliminary IEP draft therefrom, which shifted J.N.'s reading program from System 44 to Read 180, a research-based program that places equal weight on phonics, fluency, vocabulary, and comprehension. (Id.; N.T. at 709-10, 795). The parties agreed to reconvene subsequent to the issuance of an updated IEE report commissioned by Parents, to be performed by Dr. Kay. (Id.)

Based upon a second session of performance testing conducted with J.N., Dr. Kay issued the revised IEE report on May 31, 2013. (S-8; see S-30 at 8-9). Dr. Kay opined that over the course of the 2012-2013 school year, J.N. had "made measurable educational progress in math reasoning, math calculation and fluency of math facts recall." (S-8 at 13). She further reported that J.N. had "made measurable progress in spelling but trivial to no progress in basic reading skills, reading fluency[,] and reading

7

comprehension." (Id.) Among other recommendations, Dr. Kay reasoned that it was "imperative that the [District] re-vamp [J.N.'s] literacy skill instruction and change [his SDI] methodology . . . to synthetic, phonetic, code-emphasis direct instruction." (Id. at 14). Reiterating the opinion set forth in her August 2012 report, Dr. Kay advised the District to provide daily one-on-one Wilson instruction to J.N. for sixty to ninety minutes per session. (Id. at 15).

In a June 2013 phone call with representatives from the District, Dr. Kay explained her assessment of J.N.'s reading skills, stating that J.N. required Wilson instruction to make meaningful progress. (N.T. at 213-22; 590-93). Dr. Kay emphasized her opinion that J.N.'s reading skills would not improve without a more intensive regimen of phonics-based instruction. (Id. at 591).

On July 8, 2013, the parties reconvened regarding the District's proposed IEP for the 2013-2014 school year. (S-11 at 22). The draft IEP listed J.N.'s current levels of academic achievement for each subject area, together with past and present examination results and progress monitoring data. (S-20 at 8-19). Further, the proposed IEP set forth annual measurable goals based upon J.N.'s achievement levels,[7] as well as SDIs designed to facilitate J.N.'s academic performance. (Id. at 25-32).

---

[7] The draft IEP enumerated J.N.'s annual reading goals as follows: (1) "Reading Fluency and Accuracy: Given a one-minute 3rd grade reading curriculum based measurement, [J.N.] will orally read 98 words correct (25th percentile) 3 out of 4 times," and (2) "Reading Comprehension: Given a three-minute timed 4th grade passage, [J.N.] will score 15 correct responses (25th percentile) 3 out of 4 times." (S-20 at 24). In written expression, the draft IEP tasked J.N. with achieving "27 correct writing sequences (25th percentile) 3 out of 4 times" on a "three-minute 4th grade written expression curriculum based measurement." (Id. at 25).

At the meeting, the District restated its offer to implement Read 180 as J.N.'s reading instruction program for the 2013-2014 school year. (N.T. at 1563-64). According to Parents, the District was forthright in its refusal to consider Wilson as an alternative to Read 180. (Id. at 111, 1563-64). Citing Dr. Kay's May 2013 IEE report, Parents expressed dissatisfaction with the District's IEP offer of Read 180, requesting instead that the District place J.N. at Janus at its expense. (Id. at 114). The meeting concluded with no consensus reached. (Id. at 1563-64).

On July 9, 2013, Parents filed a due process complaint against the District with the Pennsylvania Office for Dispute Resolution. (S-1). Parents amended the complaint on July 15, 2013. (S-2). On July 18, 2013, the District submitted a revised IEP for Parents' consideration, which included sixty minutes of daily one-on-one Wilson instruction in addition to Read 180. (S-21 at 31). Shortly thereafter, Parents unilaterally enrolled J.N. at Janus for the 2013-2014 academic year. (See P-53 at 4). Parents additionally withdrew J.N. from the District's ESY program and enrolled him at Janus for the remainder of the summer session. (N.T. at 118).

## B.  The Hearing Officer's Decision

The due process hearing consisted of five sessions between September 23, 2013 and January 17, 2014. (Docs. 9-5 to 9-9). The Hearing Officer received testimony from J.N.'s father and mother, District administrators and staff, Dr. Kay, and a representative from Janus. (Docs. 9-5 to 9-9). The primary issues in this dispute, according to the Hearing Officer, were whether J.N. was entitled to (1) tuition reimbursement for the 2013-2014 school year at Janus, (2) compensatory education for the ESY program offered during the summer of 2013, and (3) reimbursement for

expert witness and independent evaluation services provided by Dr. Kay. (H.O.D. at 3). The time period relevant to the due process proceeding spanned from the beginning of the 2012-2013 school year to July 2013, when Parents withdrew J.N. from the District school system. (N.T. at 118). In a March 13, 2014 decision, the Hearing Officer found in favor of the District on each issue.

According to the Hearing Officer, the parties' dispute turned on their divergent views of J.N.'s reading progress over the 2012-2013 school year and his corresponding instructional needs. (H.O.D. at 7 n.3). With respect to credibility, the Hearing Officer found that Dr. Hower's testimony was especially persuasive and accorded greater weight to her assessment of J.N.'s "needs in reading and how different reading programs would address those needs" than to analogous testimony provided by other witnesses. (Id. at 15). The Hearing Officer concluded that the Read 180 program met J.N.'s needs and that the District's July 8, 2013 IEP offered J.N. a free and appropriate public education ("FAPE") for the 2013–2014 academic year. (Id. at 17-18).[8] The Hearing Officer explained:

> The specially designed instruction in the July 8th IEP creates appropriate vehicles for the delivery of instruction to help the student make progress on those goals. Read 180, the reading program which would address the student's need for specially designed instruction in reading, would meet those needs. Here, the testimony of the District's reading supervisor[, Dr. Hower,] was very persuasive. Her testimony, in light of the record on the student's 2012-2013 school year, was highly persuasive that a broad-based reading program is appropriate for the student, as opposed to programs that are centered on phonics/decoding (such as System 44 or the Wilson Reading System). In sum, then, the

---

[8] The Hearing Officer declined to address the District's July 18, 2013 IEP proposal. (H.O.D. at 16 n.4).

> District's program, from needs-identification to goals to instruction to placement, is reasonably calculated to yield meaningful educational benefit.

(Id. at 17).  Consequently, the Hearing Officer found that Parents were not entitled to tuition reimbursement for J.N.'s enrollment at Janus for the 2013-2014 academic year. (Id. at 18).

The Hearing Officer also declined to award any compensatory education for ESY programming.  (Id. at 18-19).  Noting a paucity of evidence pertaining to the District's ESY program, he concluded that the exiguous record nonetheless supported a finding that the District met its obligation to provide a FAPE for the summer of 2013. (Id. at 19).  Finally, the Hearing Officer held that by offering J.N. a FAPE for the summer of 2013 and for the 2013-2014 school year, the District did not violate Section 504.  (Id. at 19-20).

## C.    Procedural History

Plaintiffs filed a complaint in this court on May 21, 2014 pursuant to the IDEA and Section 504.[9]  (Doc. 1).  On July 14, 2014, plaintiffs moved to supplement the administrative record with certain exhibits which the Hearing Officer excluded from the administrative proceedings.  (Doc. 10).  The court denied plaintiffs' motion on September 24, 2014, finding the proffered evidence to be cumulative, privileged, prejudicial, and irrelevant, respectively.  (Doc. 25).

On October 31, 2014, both parties moved for judgment on the administrative record.  (Docs. 29, 30).  On appeal, plaintiffs petition for reversal of the Hearing

---

[9] Under the IDEA, any party aggrieved by the outcome of a due process hearing may commence an action in a federal district court without regard to the amount in controversy.  20 U.S.C. § 1415(i)(2)(A).

Officer's decision and seek reimbursement for tuition and related expenses, compensatory education, reimbursement for expert services and testimony, and costs and fees. (Doc. 1 at 22). The District requests that the court affirm the Hearing Officer's decision. (Doc. 30 at 1). The cross-motions have been fully briefed and are ripe for disposition.[10]

## II.    Legal Standard

When reviewing state administrative decisions under the IDEA, a district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C § 1415(i)(2)(C). The Court of Appeals for the Third Circuit has described this standard as "modified *de novo*" review under which the district court must give "due weight" to the findings of the hearing officer. P.P. *ex rel.* Michael P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 734 (3d Cir. 2009). Pursuant to this standard, the hearing officer's factual findings should be considered *prima facie* correct; if the district court does not accept those findings, it is obligated to explain why. S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 270 (3d Cir. 2003); see also Carlisle Area Sch. v. Scott P., 62 F.3d 520, 527 (3d Cir. 1995) (noting that district courts are free to accept or reject administrative findings of fact but must justify any departures from the agency's decision). A district court must also accept the hearing officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the

---

[10] On November 17, 2014, plaintiffs requested that the court strike the District's statement of undisputed material facts, arguing that said filing was unsolicited, unnecessary to the motions before the court, and prejudicial to plaintiffs. (Doc. 37; see Doc. 38). The court granted plaintiffs' motion to strike on August 21, 2015. (Doc. 46).

record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." S.H., 336 F.3d at 270 (quoting Carlisle, 62 F.3d at 529).

A district court's review of the hearing officer's application of legal standards and conclusions of law is plenary. Jana K. *ex rel.* Tim K. v. Annville-Cleona Sch. Dist., 39 F. Supp. 3d 584, 594 (M.D. Pa. 2014) (citing Warren G. v. Cumberland Cty. Sch. Dist., 190 F.3d 80, 83 (3d Cir. 1999)). The Hearing Officer's conclusions regarding tuition reimbursement and compensatory education are accordingly subject to plenary review. P.P., 585 F.3d at 735. The reviewing court should not, however, "substitute its own notions of sound educational policy for those of local school authorities." S.H., 336 F.3d at 270 (citation omitted). Subject to the foregoing standards, the district court may make findings by a preponderance of the evidence and grant appropriate relief, including attorneys' fees and compensatory education. D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 (3d Cir. 2010).[11]

The party challenging the appropriateness of an IEP bears the burden of persuasion at the administrative level. L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 391-92 (3d Cir. 2006) (citing Schaffer v. Weast, 546 U.S. 49 (2005)). On appeal before the district court, the burden of persuasion lies with the party challenging the administrative decision. Ridley Sch. Dist. v. M.R., 680 F.3d 260, 270 (3d Cir. 2012).

---

[11] The Third Circuit has not identified the precise standard of review which governs Section 504 claims under the Rehabilitation Act. See T.F. v. Fox Chapel Area Sch. Dist., 589 F. App'x 594, 598 (3d Cir. 2014). In the exercise of caution, the court notes that its holding with respect to plaintiffs' Section 504 claim would remain the same under either the *de novo* standard or the modified *de novo* standard.

In the case *sub judice*, plaintiffs bear the burden of demonstrating that the Hearing Officer's decision was erroneous.

**III.  Discussion**

**A.     Tuition Reimbursement for the 2013-2014 Academic Year**

Under the IDEA, children with disabilities must "have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  After a district identifies a child who requires special education, it must develop an IEP for that child. Id. § 1412(a)(4).  An IEP is the primary vehicle for providing students with a FAPE. S.H., 336 F.3d at 264.  It must be reasonably calculated to allow a student to receive "meaningful educational benefits" in light of the student's intellectual potential. Shore Reg'l High Sch. Bd. of Educ. v. P.S. *ex rel.* P.S., 381 F.3d 194, 198 (3d Cir. 2004) (quoting Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 181 (3d Cir. 1988)).  However, the IEP need only offer a "basic floor of opportunity."  Carlisle, 62 F.3d at 533-34.  A district is not required to "maximize the potential of handicapped children" in order to provide a FAPE.  T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 577 (3d Cir. 2000) (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 197 n.1 (1982)).

When school authorities fail to institute a FAPE, the school "must reimburse the child's parents for the costs of attendance at a private school that is able to provide a FAPE."  Ridley, 680 F.3d at 269; see 20 U.S.C. § 1412(a)(10)(C)(ii); 34 C.F.R. § 300.148(c); Florence Cty. Sch. Dist. Four v. Carter *ex rel.* Carter, 510 U.S. 7, 12 (1993).

It is well-established that a court may order tuition reimbursement if "(1) the court determines that the student's IEP is inappropriate and (2) the student demonstrates that the private placement he [sought was] proper." Lauren W. *ex rel.* Jean W. v. DeFlaminis, 480 F.3d 259, 276 (3d Cir. 2007). "The issue of whether an IEP is appropriate is a question of fact." D.S., 602 F.3d at 564.

In the instant case, the Hearing Officer denied Parents' request for tuition reimbursement based upon a finding that the District's July 8, 2013 IEP was appropriate.[12] (H.O.D. at 18). The Hearing Officer's decision derived from a

_____

[12] Plaintiffs contend that the Hearing Officer incorrectly based his decision on the July 8, 2013 IEP rather than the July 18, 2013 IEP. (Doc. 34 at 19-21, 23). They assert that "both sides argued the July 18, 2013 IEP" and that, as a result, plaintiffs did not receive "a meaningful opportunity to be heard." (Id. at 20-21). In response, the District avers that "the only substantive difference in the July 18, 2013 IEP was the addition of 60 minutes of Wilson programming on top of the previously offered Read 180 (and specific SDI describing Read 180), STOs for written expression[,] and more specific language on the type of [assistive technology] support to be provided to J.N." (Doc. 32 at 12-13).

The court finds that the administrative record entirely corroborates the District's riposte. Indeed, the vast majority of the evidence and testimony presented at the administrative proceedings concerned the issue of whether J.N. made meaningful progress between 2012 and 2013, such that Read 180 was an appropriate instructional selection—a question which is relevant to both IEPs. Moreover, plaintiffs contradict their own expostulation by asserting identical arguments against the two IEPs throughout their briefing. (See, e.g., Doc. 34 at 23 ("Dr. Kay's criticism of the District's program and placement applies to both of the District's July, 2013 IEPs.")). Thus, plaintiffs' argument is of no moment to the court's analysis.

Plaintiffs also assert that by presenting two IEP proposals, the District failed to offer "a single, defined program and placement," thereby denying Parents "a meaningful role in the process of formulating an IEP." (Id. at 21-22). Plaintiffs' claim misses the mark. Plaintiffs misapprehend the procedural requirements of the IDEA by conflating the draft IEPs at issue herein with the formal, operative document which ultimately governs a disabled child's instructional program. See 20 U.S.C. § 1414; D.S., 602 F.3d at 565. The District did not act in contravention of the IDEA by (1) presenting a draft IEP to Parents on July 8, 2013; (2) amending the IEP thereafter; and (3) presenting a revised draft on July 18, 2013. Plaintiffs' argument is therefore misplaced in the context of the matter *sub judice*.

15

determination that J.N. made meaningful progress in reading during the 2012-2013 school year, rendering the District's offer of Read 180 a FAPE.[13] (Id. at 16-17). Clearly, the Hearing Officer placed considerable weight on Dr. Hower's testimony. (Id. at 17). Following a thorough examination of the administrative record, and applying the appropriate modified *de novo* standard, the court will review the Hearing Officer's decisive findings of fact and credibility determinations.

### 1. *J.N.'s Progress During the 2012-2013 Academic Year*

The court first considers whether J.N. made meaningful progress during the 2012-2013 academic year. The record is replete with evaluative mechanisms used by the parties to gauge J.N.'s educational development between the fall of 2012 and the spring of 2013. The parties proffer wholly divergent views of this evidence.

Plaintiffs contend that the objective evidence of record demonstrates that J.N.'s performance levels in reading and writing showed minimal improvement over the

---

[13] Regarding the July 8, 2013 IEP draft, the Hearing Officer additionally concluded the following: (1) the IEP properly identified and addressed J.N.'s needs; (2) J.N.'s reading goals were "explicit and measurable . . . and . . . in line with where [J.N.] was surfacing in May 2013 when the District generated . . . assessments of [his] reading at that time;" and (3) J.N.'s non-reading goals were "reasonably grounded in data and assessment of the student" and were also "explicit and measurable." (H.O.D. at 16-17).

Plaintiffs assert broadly that the annual reading goals and SDIs set forth in the July 8 and July 18 IEPs failed to consider J.N.'s unique needs. (Doc. 34 at 24, 27). Plaintiffs cite Dr. Kay's testimony that the IEPs' objectives and SDIs merely recited state standards and were not adequately "spelled out." (Id. (citing N.T. at 187, 246-48)). Thereafter, plaintiffs offer no further analysis or reasoning on this point. Contrarily, the court finds that said goals and SDIs were individualized, measurable, and precisely drawn. (See S-20 at 24-32). Without more, the court forthwith confirms the Hearing Officer's finding that the goals and SDIs in the July 8, 2013 IEP were appropriate. (H.O.D. at 16).

course of the school year.[14]  (Doc. 34 at 29).  Specifically, they direct the court to J.N.'s

test results on four normed examinations: (1) the Wechsler Individual Achievement

Test, Third Edition ("WIAT-III"), (S-8 at 14, 74-93); (2) the Pennsylvania System of

School Assessment ("PSSA"), (S-36); (3) the Kaufman Test of Educational

Achievement, 2nd Edition ("KTEA-II"), (P-35 at 13-14); and (4) Study Island, (P-24

at 7-8).

Dr. Kay administered the WIAT-III to J.N. in July 2012 and in May 2013.

(S-4; S-8).  In her May 2013 IEE report, Dr. Kay juxtaposed J.N.'s sequential reading

scores as follows: reading comprehension, 93 to 87; word reading, 71 to 68;

pseudoword decoding, 79 to 83; oral reading fluency, 79 to 74; basic reading skills,

75 to 76; and reading comprehension/fluency, 82 to 76.  (S-8 at 14).  At the due process

hearing, Dr. Kay noted that such "standard scores" do not change when a student has

made a year's worth of progress.  (N.T. at 198-99).  Rather, scores increase when a

student has made more than a year of progress and decrease when a student has made

less than a year of progress.  (Id.)  Dr. Kay explained that the WIAT-III examination

generated J.N.'s scores by comparing him to other students of the same age.  (N.T. at

199).

---

[14] Plaintiffs fail to proffer evidence in support of their contention that J.N.'s writing skills did not meaningfully improve during the 2012-2013 academic year.  (See Doc. 34 at 29).  Further, plaintiffs do not explain how such a finding would render the District's July 8, 2013 IEP draft inappropriate.  The court recognizes that J.N. did not meet the annual writing goal set forth in his 2012-2013 IEP.  (P-42 at 5; see P-11 at 18; S-20 at 14-15).  However, this fact alone is insufficient to support a finding that the District's July 8, 2013 IEP proposal failed to offer a FAPE.

The parties do not dispute whether J.N. made meaningful progress in other areas of study.  Accordingly, consistent with the Hearing Officer, the court will focus its review exclusively on J.N.'s advancement in reading.  (See H.O.D. at 7 n.3).

In the spring of 2013, J.N. took the PSSA—a state-sponsored standards-based assessment—at the sixth-grade level. (S-36). His reading performance ranked "below basic," consisting of 12 out of 28 possible points in comprehension and reading skills and 8 out of 24 points in interpretation and analysis of fictional and nonfictional text. (Id. at 2). In April 2013, the District also evaluated J.N. using the KTEA-II standardized achievement test. (P-35 at 13-14). Therein, J.N. scored in the "below average range" on letter and word recognition, reading comprehension, overall reading, and spelling. (Id.) Finally, the District assessed J.N.'s performance with Study Island, a benchmark evaluation tool designed to predict students' PSSA scores. (P-24 at 7-8; S-35 at 1; N.T. at 654-56). J.N.'s Study Island reading scores oscillated between "basic" and "below basic," as compared to other sixth-grade students. (P-24 at 7-8). He began and concluded the school year at the "basic" level. (S-35 at 1).

Counterpoising plaintiffs, the District cites J.N.'s performance on three criterion-referenced reading examinations in support of its assertion that J.N. made meaningful progress in reading over the 2012-2013 academic year: (1) Fountas & Pinnell ("F&P"), (S-33); (2) Scholastic Phonics Inventory ("SPI"), (S-34 at 8); and (3) Scholastic Reading Inventory ("SRI"), (S-34 at 10). These evaluation methods rely on criteria specifically designed to gauge reading progress, as opposed to assessing students against an age- or grade-based population. (N.T. at 739, 748).

Dr. Hower administered the F&P to J.N. in August 2012 and in June 2013. (Id. at 800). Scaled from A to Z, the F&P permits students to advance between reading levels after meeting certain enumerated standards. (Id. at 799-802; see S-33 at 39). Each reading level corresponds with a general grade level. (S-33 at 39). Between

August 2012 and June 2013, J.N. advanced four levels, from K to O: the equivalent of moving from the fall of second grade to the spring of third grade. (N.T. at 800-02). Dr. Hower interpreted these results to indicate that J.N. made over one year of progress in reading. (Id. at 802).

The District also evaluated J.N. using the SPI and the SRI in August 2012 and in May 2013. (S-34 at 4-5; 10). The SPI and the SRI are associated with System 44 and Read 180, respectively. (N.T. at 748). Similar to the F&P, these assessments provide criterion-referenced analysis intended to assist school administrators in determining the appropriate reading program for students with reading disabilities. (Id.) Over the course of the year, J.N. advanced from "beginning decoder" to "developing decoder" on the SPI and from a Lexile score of 426 to a Lexile score of 516 on the SRI. (S-34 at 4-5; 10). According to Dr. Hower, J.N.'s 90-point Lexile score increase represented close to one year of reading development. (N.T. at 795).

In his decision, the Hearing Officer recognized J.N.'s progress on the F&P, the SPI, and the SRI. (H.O.D. ¶¶ 45, 46). He additionally acknowledged J.N.'s mastery of the annual reading goals set forth in his 2012-2013 IEP. (Id. ¶¶ 18, 23, 27, 29-32). Ultimately, the Hearing Officer concluded that the SDIs in the July 8, 2013 IEP "create[d] appropriate vehicles for the delivery of instruction to help [J.N.] make progress" and that "Read 180 . . . would meet [J.N.'s] needs." (Id. at 17). He supported this determination by stating that Dr. Hower's testimony was persuasive "in light of the record on [J.N.'s] 2012-2013 school year." (Id. at 17). The court accepts the Hearing Officer's finding that J.N. made meaningful advancement in reading,

rendering Read 180 an appropriate instructional program for his 2013-2014 academic year.

To the extent that the Hearing Officer found the criterion-referenced testing to be a more cogent measure of J.N.'s progress than the normed examinations, the court agrees. Plaintiffs' evidence falls far short of undermining such a conclusion. Quite simply, Parents could not reasonably have expected the District to close a three- to four-year gap in J.N.'s reading ability in one year. The normed testing results upon which they rely merely reiterate the severity of J.N.'s special needs in reading. They do not, however, provide an accurate assessment of J.N.'s progress. The IDEA required the District to provide J.N. with a "basic floor of opportunity." <u>Carlisle</u>, 62 F.3d at 533-34. In view of the foregoing, and considering J.N.'s criterion-referenced testing metrics and his success in meeting annual goals, the court concurs with the Hearing Officer's findings.

## 2. *The Hearing Officer's Credibility Determinations*

The court next considers the Hearing Officer's determinations regarding the credibility of certain testifying witnesses. As stated *supra*, the Hearing Officer found all witnesses to be credible and determined that the testimony of Dr. Hower was "especially persuasive." (H.O.D. ¶¶ 57-58). He subsequently accorded Dr. Hower's testimony "more weight than other witnesses in terms of [J.N.'s] needs in reading and how different programs would address those needs." (Id. ¶ 58). Plaintiffs argue that the Hearing Officer erred in his evaluation of Dr. Hower's and Dr. Kay's credibility. (Doc. 34 at 29-31).

At the hearing, Dr. Hower and Dr. Kay each opined on whether J.N. made meaningful progress over the 2012-2013 school year; which tests and evaluations accurately measured J.N.'s progress; and which reading program met J.N.'s needs in the summer of 2013. (N.T. at 131-258, 697-927). Plaintiffs aver that the Hearing Officer discounted the following significant information pertaining to Dr. Hower: (1) she is not certified in Wilson instructional methods; (2) she is not trained in special education; (3) she did not instruct J.N.; and (4) she did not observe J.N. in a classroom setting. (Doc. 34 at 29-30). By contrast, plaintiffs assert that the Hearing Officer undervalued Dr. Kay's extensive special education qualifications and her thirty years of experience as a licensed school psychologist. (Id. at 30-31). The District responds that Dr. Hower's expertise in reading eclipsed Dr. Kay's training and experience in special education. (Doc. 32 at 20-21). The District contends that Dr. Hower's "many years of experience in prescribing educational programs for children with reading disabilities" lends substantial weight to the Hearing Officer's valuation of her testimony. (Id. at 21).

When a hearing officer finds one witness to be more credible than another after observing live testimony, his determination is "due special weight." D.S., 602 F.3d at 564. A district court is compelled to accept a hearing officer's credibility determinations unless the "non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." S.H., 336 F.3d at 270 (quoting Carlisle, 62 F.3d at 529). In the instant case, plaintiffs fail to point to any non-testimonial evidence that would undermine Dr. Hower's testimony or the Hearing Officer's assessment thereof. Neither does the record, considered *in toto*, call the Hearing Officer's determinations

into question.  *Per contra*, the court finds the evidence of record to be supportive in all respects.

For example, Dr. Kay testified that she "had no familiarity" with the programming or resources available to the District.  (N.T. at 172).  Moreover, recalling a June 2013 phone conversation with Dr. Kay, Dr. Hower stated that Dr. Kay appeared to be unfamiliar with the Scholastic Phonics Inventory, the Scholastic Reading Inventory, and the Fountas & Pinnell examinations.  (Id. at 815-16).  Dr. Hower further noted that during her testimony at the hearing, Dr. Kay mischaracterized these examinations as "curriculum-based" rather than criterion-referenced.  (Id. at 816).  The contents of the hearing thus support the Hearing Officer's finding that Dr. Kay's testimony did not warrant greater reliance than testimony provided by other witnesses.

Additionally, Dr. Hower proffered convincing testimony regarding J.N.'s poor performance on normed examinations.  Specifically, she opined that J.N.'s Study Island scores were foreseeably low because the reading passages therein were at the sixth grade level.  (N.T. at 827).  Dr. Hower further posited that using the PSSA to determine "what [J.N.] accomplished throughout the year[] [was] completely inappropriate[] because [the PSSA] is a sixth grade test with sixth grade reading passages" well above J.N.'s skill level.  (Id. at 830).  Ultimately, Dr. Hower expressed strong reservations regarding the use of norm-referenced testing to inform specialized reading instruction decisions.  (Id. at 877).  She testified that criterion-referenced evaluations are "more widely accepted" for this purpose.  (Id.)

Dr. Hower also testified extensively concerning J.N.'s reading progress and his corresponding instructional needs. She explained that J.N.'s SRI testing in August 2012 placed him at a higher Lexile level (426) than typically recommended for the System 44 program (350 and below). (Id. at 749-50). Nonetheless, the District initially elected to instruct J.N. using System 44 based on (1) his poor F&P performance; and (2) Dr. Kay's July 2012 IEE and corresponding recommendations. (Id. at 751). Dr. Hower noted that System 44's creators recommend that students stay in the program for no more than twelve months. (Id. at 795). Dr. Hower testified as follows:

> My opinion, especially in light of the [one-year] recommendation of the System 44 program, in addition to how much further away [J.N.] was [in June 2013] from the district's criteria of 350 being the [highest SPI score for which System 44 is appropriate], that then we start to think whether the phonics[-based] instruction is good for [J.N.], given all of the data that I collected through the [F&P] . . . . [C]omprehension was what was coming up as being the strongest need. And . . . doing words in isolation and working on word parts and how words are put together is not going to achieve fluency and comprehension skills. . . .
>
> [J.N.] reached the threshold of . . . third grade reader, [and] in the reading world, we say that K to 2 you are learning to read, but when you reach the third grade reading level, . . . you have the ability to read to learn. . . . [We would] hold him back by keeping him in a phonics-only instructional program.

(Id. at 795-96, 800). For these reasons, the court is satisfied that the Hearing Officer did not err in according additional weight to Dr. Hower's testimony.

The Hearing Officer concluded on the basis of the testimony adduced during the due process hearing and the aforementioned indicators of J.N.'s performance that the July 8, 2013 IEP proposal was reasonably designed to confer a meaningful

educational benefit tailored to J.N.'s specific needs. (H.O.D. at 15-18). The court finds

no basis in the administrative record for overturning this determination. See <u>D.S.</u>, 602

F.3d at 564. Accordingly, as plaintiffs have not met their burden of demonstrating that

the Hearing Officer's decision regarding tuition reimbursement was erroneous, the

decision will be affirmed.

### B. Compensatory Education for Summer 2013 ESY Services

A student is entitled to compensatory education when he has been denied a

FAPE. <u>P.P.</u>, 585 F.3d at 739. Compensatory education is an equitable remedy that

seeks to provide the educational services to which a student was entitled. <u>Jana K.</u>, 39

F. Supp. 3d at 608 (citing <u>Lester H. v. Gilhool</u>, 916 F.2d 865, 872 (3d Cir. 1990)). A

compensatory education award aims "to place disabled children in the same position

they would have occupied but for the school district's violations of IDEA." <u>Ferren C.

v. Sch. Dist. of Phila.</u>, 612 F.3d 712, 717-18 (3d Cir. 2010) (quoting <u>Reid v. District of

Columbia</u>, 401 F.3d 516, 518 (D.C. Cir. 2005)).

The Hearing Officer in the matter *sub judice* declined to award compensatory

education for ESY services during the summer of 2013. He concluded that the limited

evidence of record pertaining to the District's ESY programming supported a finding

that the District provided J.N. with an offer of FAPE. (H.O.D. at 18-19).

The record demonstrates that in February 2013, the parties revised J.N.'s IEP to

include an individualized program of ESY services for the following summer.

(S-16 at 47-48). J.N.'s prospective ESY program comprised twenty-nine hours of

instruction and progress monitoring divided over five weeks—ten hours to be

dedicated to mathematics, ten hours to reading skills, ten hours to assistive

technology, and four hours to encoding.  (Id. at 48).  On February 19, 2013, Parents signed the amended IEP and an accompanying Notice of Recommended Educational Placement, which memorialized the parties' agreement as to J.N.'s ESY eligibility. (S-16).  The District's meeting records indicate that Parents "were pleased with the [ESY] services offered."  (S-22 at 1).  J.N. completed a portion of the program in June and July of 2013, when Parents elected to enroll him at Janus for the remainder of the summer session.  (N.T. at 118).

At the due process hearing, J.N.'s speech instructor, Mr. Michael McKinley, testified that the auditory component of J.N.'s ESY program focused on sustaining newly developed skills and preparing J.N. to meet his 2013-2014 annual goals.  (Id. at 1004, 1007-08).  Additionally, Mr. Ryan Quinn ("Mr. Quinn"), J.N.'s mathematics and assistive technology teacher, testified that J.N.'s ESY curriculum concentrated on J.N.'s weakest areas—as identified by Study Island and J.N.'s classroom performance—in anticipation of the upcoming school year.  (Id. at 1223).  Mr. Quinn stated that over the course of the summer, J.N. surpassed his end-of-year goals in math applications and math computations and showed marked improvement in typing.  (Id. at 1222-24).  Mr. Quinn also noted that J.N.'s IEP team endeavored to place considerable emphasis on J.N.'s typing skills, recognizing that "it was critical for him to be able to type at a certain level in order to really benefit from assistive technology."  (Id. at 1222).  J.N.'s language arts teacher, Ms. Suzanne Williamson ("Ms. Williamson"), also testified regarding J.N.'s ESY sessions.  (Id. at 1318-22).  J.N. completed all ten scheduled lessons with Ms. Williamson; therein, he nearly achieved his anticipated 2013-2014 reading accuracy goals.  (Id. at 1322).  Ms. Williamson further

testified that she instructed J.N. using, *inter alia*, Read 180 and System 44 and that she "thought he did very well" with the Read 180 instructional methods. (Id. at 1321).

Plaintiffs argue that compensatory education is warranted because the District failed to offer Wilson as a part of J.N.'s ESY program. (Doc. 34 at 37). Further, relying on Dr. Kay's May 2013 IEE report, plaintiffs assert that J.N. required "training . . . in the use of assistive technologies to facilitate the writing process." (Id.) Finally, plaintiffs contend that the February 2013 IEP amendment failed to enumerate clear annual goals and SDIs for J.N.'s ESY program. (Id. at 38). For the reasons that follow, plaintiffs' averments miss the mark.[15]

Under the IDEA, the District was not required to select the specific teaching program requested by Parents. Ridley, 680 F.3d at 278. Moreover, the court concurs with the Hearing Officer's finding that the District's offer of Read 180 was reasonably calculated to promote comparable progress. (H.O.D. at 17). Thus, as discussed in greater detail *supra*, the District did not fail to offer a FAPE by proffering System 44 and Read 180 instead of Wilson for J.N.'s ESY programming.

Additionally, Mr. Quinn testified that J.N.'s ESY schedule offered assistive technology instruction in typing, with the goal of improving J.N.'s written expression in the 2013-2014 school year. (N.T. 1222). Plaintiffs fail to point the court to nontestimonial extrinsic evidence in the administrative record to justify a conclusion

---

[15] Plaintiffs also claim that the District rescinded its offer of ESY services by "declar[ing] J.N. ineligible" in an IEP dated May 15, 2013. (Doc. 34 at 38; see P-24 at 29). However, the document to which plaintiffs refer is a draft IEP for the 2013-2014 school year. (P-24 at 1, 29 (indicating that J.N.'s "eligibility for ESY will be determined no later than February of 2014")). Hence, the court declines to address this argument further.

that Mr. Quinn's testimony was unreliable. In his decision, the Hearing Officer concluded that all witnesses testified credibly. (H.O.D. ¶ 57). According appropriate deference to the Hearing Officer's credibility determination, the court accepts Mr. Quinn's testimony as reliable. See S.H., 336 F.3d at 270. Therefore, plaintiffs' contention that the District eschewed assistive technology as a means of facilitating J.N.'s progress in writing is unavailing.

Lastly, plaintiffs have not demonstrated that the IEP revisions which set forth J.N.'s ESY services lacked sufficient detail. The IDEA's implementing regulations define ESY services as "special education and related services that . . . [a]re provided to a child with a disability . . . [b]eyond the normal school year of the public agency; . . . [i]n accordance with the child's IEP; and . . . [a]t no cost to the parents of the child." 34 C.F.R. § 300.106(b)(1). Students are eligible for ESY services when academic gains will likely be jeopardized by an extended break in instruction. See M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cty., 303 F.3d 523, 537-38 (4th Cir. 2002); Coleman v. Pottstown Sch. Dist., 983 F. Supp. 2d 543, 566 (E.D. Pa. 2013). Pennsylvania's education regulations require an IEP team to make "determinations about the services to be provided" once ESY programming is deemed necessary. 22 Pa. Code. § 14.132(a)(1). However, neither the IDEA's implementing regulations nor Pennsylvania's education regulations prescribe the manner or extent to which ESY services are to be delineated.

It is clear to the court that the ESY services enumerated by the District, viewed in the context of J.N.'s February 2013 IEP, were adequately comprehensive. (S-16). Plaintiffs cite no authority in support of their assertion that the goals and SDIs set

27

forth in the 2012-2013 IEP did not govern the ESY amendments.  Moreover, the

testimony provided by J.N.'s instructors indicated that his ESY sessions incorporated

and built upon his objectives and SDIs from the 2012-2013 school year.  (N.T. at 1004,

1007-08, 1222-24, 1318-22).  Consequently, plaintiffs have not met their burden of

persuasion to demonstrate that the District failed to provide J.N. with an offer of

FAPE during the summer of 2013.  The Hearing Officer's decision to deny

compensatory education is therefore affirmed.

### C.      Reimbursement for Expert Testimony and Evaluation Services

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified

individual with a disability in the United States . . . shall, solely by reason of her or his

disability, be excluded from the participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial

assistance."  29 U.S.C. § 794(a).  As the Third Circuit has explained, Section 504's

"negative probation" on disability discrimination is substantially similar to the IDEA's

"affirmative duty."  Ridley, 680 F.3d at 280 (quoting W.B. v. Matula, 67 F.3d 484, 492-93

(3d Cir. 1995)).  Like the IDEA, Section 504 entitles disabled students to a FAPE.

34 C.F.R. § 104.33(a) ("A recipient that operates a public elementary or secondary

education program or activity shall provide a free appropriate public education to

each qualified handicapped person who is in the recipient's jurisdiction."); see, e.g.,

D.K. v. Abington Sch. Dist., 696 F.3d 233, 253 n.8 (3d Cir. 2012) ("As under the IDEA,

providing a FAPE in accordance with § 504 requires a school district to 'reasonably

accommodate the needs of the handicapped child so as to ensure meaningful

participation in educational activities and meaningful access to educational benefits.' " (quoting Ridley, 680 F.3d at 280)).

In the instant case, plaintiffs' Section 504 claim is derivative of their IDEA claim. Having found that the District offered a FAPE under the IDEA, the court need not separately consider whether the District provided a FAPE under Section 504. See Andrew M. v. Del. Cty. Office of Mental Health & Mental Retardation, 490 F.3d 337, 350 (3d Cir. 2007). The court finds that plaintiffs are ineligible to be reimbursed for expert testimony and independent evaluation services provided by Dr. Kay. The court thus affirms the Hearing Officer's decision that the District met its obligations under Section 504.[16] (H.O.D. at 19-20).

## IV. Conclusion

For all of the foregoing reasons, the Hearing Officer's decision is affirmed. The court will deny plaintiffs' motion for judgment on the administrative record and grant the District's motion for disposition on the administrative record. An appropriate order will issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:      September 15, 2015

---

[16] Plaintiffs additionally seek an award of reasonable attorneys' fees and costs. See 20 U.S.C. § 1415(i)(3)(B) ("In any action brought under [the IDEA], the court, in its discretion may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of the child with a disability."). Plaintiffs' request is denied as they have not prevailed in the matter *sub judice*.